372 So.2d 913 (1978)
Reubin O'D. ASKEW et al., Appellants,
v.
CROSS KEY WATERWAYS et al., Appellees.
Reubin O'D. ASKEW et al., Appellants,
v.
POSTAL COLONY CO., INC., et al., Appellees.
Nos. 52251, 52252.
Supreme Court of Florida.
November 22, 1978.
Rehearing Denied February 15, 1979.
Robert L. Shevin, Atty. Gen., and James D. Whisenand, Deputy Atty. Gen. and Martin S. Friedman, Asst. Atty. Gen., Tallahassee, for appellants.
Murray H. Dubbin and Evan Langbein of Dubbin, Schiff, Berkman & Dubbin, Charles H. Netter, Miami, and Tittle & Tittle, P.A., Tavernier, for Cross Key Waterways.
*914 Richard W. Ervin, Joseph C. Jacobs and Robert J. Angerer of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for City of Key West.
E. Snow Martin of Martin & Martin, Lakeland, for Postal Colony Co., Inc.
Richard E. Nelson of Nelson, Hesse, Cyril, Weber & Sparrow, Sarasota, amicus curiae, for Sarasota County.
William L. Earl and Sandra R. Scott of Peeples, Earl & Blank, Miami, amicus curiae, for William L. Earl.
Parker D. Thomson and Janice S. Burton of Paul & Thomson, Alan Milledge and Earl G. Gallop of Milledge & Hermelee, and Joseph Z. Fleming of Fleming & Neuman, Miami, amicus curiae, for Florida Audubon Society and League of Women Voters.
Bruce C. Starling, Gen. Counsel, and Nancy G. Linnan, Asst. Gen. Counsel, Tallahassee, amici curiae, for Reubin O'D. Askew, Governor, State of Florida.
SUNDBERG, Justice.
We deal today with the constitutionality of the provisions of Section 380.05(1), Florida Statutes (1975), for designation of areas of critical state concern by use of the criteria stated in Section 380.05(2)(a) and (b), Florida Statutes (1975). The issue reaches us by appeal from two separate decisions of the District Court of Appeal, First District,[1] which have been consolidated for review by this Court. Because each case was ultimately disposed of upon the constitutional invalidity of the aforementioned statutory provisions jurisdiction reposes in this Court pursuant to Article V, Section 3(b)(1), Florida Constitution.
Responding to the policy and mandate contained in Article II, Section 7, Florida Constitution,[2] in 1972 the legislature enacted the "Florida Environmental Land and Water Management Act," Chapter 72-317, Laws of Florida, Chapter 380, Florida Statutes.[3] Section 380.05(1)(a) of the enactment empowers the Division of State Planning to recommend areas of critical state concern to the Governor and cabinet acting as the Administration Commission.[4] In its recommendation the Division of State Planning must designate the boundaries of the proposed area of critical state concern, explain the reasons for its conclusion that the area is of critical concern to the state or region, the dangers which would result from uncontrolled or inadequate development of the area, and the advantages to be gained from the development of the area in a coordinated manner. In addition, the Division of State Planning recommends specific principles for guiding the development of the proposed area.
Section 380.05(2), Florida Statutes (1975), enunciates the criteria which the Division of State Planning shall utilize in determining whether to recommend designation of a particular area as one of critical state concern:
(2) An area of critical state concern may be designated only for:
(a) An area containing, or having a significant impact upon, environmental, historical, natural, or archaeological resources of regional or statewide importance.
(b) An area significantly affected by, or having a significant effect upon, an *915 existing or proposed major public facility or other area of major public investment.
(c) A proposed area of major development potential, which may include a proposed site of a new community, designated in a state land development plan.
Prior to submitting a recommendation with respect to an area of critical state concern to the Administration Commission, the Division of State Planning must give notice to all local governments and regional planning agencies included within the proposed boundaries, including any notice required by Chapter 120, Florida Statutes (1975),[5] the Administrative Procedure Act, the provisions of which govern the actions taken by the Division of State Planning and the Administration Commission under Chapter 380. Section 380.05(4) and (8), Florida Statutes (1975); Section 120.72, Florida Statutes (1975).
Within 45 days after receiving the recommendations of the Division of State Planning, the Administration Commission must either reject the recommendations or adopt them with or without modification. Thereafter, by rule, the Administration Commission designates the area of critical state concern and approves the principles for guiding development of the designated area. Section 380.05(1)(b), Florida Statutes (1975). The Administration Commission is statutorily prohibited from designating more than five percent, in the aggregate, of the land within the state (approximately 1.8 million acres) as an area of critical state concern. Section 380.05(17), Florida Statutes (1975).
Section 380.05(5) provides that:
After the adoption of a rule designating an area of critical state concern the local government having jurisdiction may submit to the state land planning agency its existing land development regulations for the area, if any, or shall prepare, adopt and submit new or modified regulations, taking into consideration the principles [for guiding development] set forth in the rule designating the area as well as the factors that it would normally consider.
Subsection (7) of Section 380.05 directs the Division of State Planning to provide technical assistance to the local government in the preparation of the proposed land development regulations. If the Division of State Planning determines that the land development regulations submitted by the local government comport with the principles for guiding development, it shall by rule approve the locally-promulgated land development regulations. Section 380.05(6). The regulations are not effective until the Division of State Planning's rule approving them becomes effective which, under Section 120.54(11), Florida Statutes (1975), is 20 days after it is filed with the Secretary of State.[6]
If the relevant local government fails to propose land development regulations within six months of adoption of the rule designating the area of critical state concern or, if such regulations have been proposed but the Division of State Planning concludes that they do not comply with the principles for guiding development for the area, within 120 days thereafter the Division of State Planning must recommend land development regulations to the Administration Commission. Section 380.05(8). The Administration Commission is allowed forty-five days after the receipt of recommended regulations, if any, from the Division of State Planning within which to reject the same or adopt them with or without modification. The Administration Commission must establish the land development regulations, by rule, within the forty-five day period as well. This rule must specify to what extent the regulations will supersede or supplement local land development regulations. Section 380.05(8). Although *916 the regulations are administered by the local government, the Division of State Planning may initiate judicial proceedings to compel their enforcement if it concludes that local administration is inadequate. Section 380.05(8) and (9). Chapter 380 possesses the flexibility to conform to changed needs and conditions of a designated area of critical state concern by permitting the local government to propose new land development regulations after the initial regulations have been approved by the Division of State Planning or the Administration Commission. Section 380.05(10). It is essential under the statutory scheme that land development regulations become effective within twelve months after the adoption of the rule designating the area of critical state concern. If this condition is not fulfilled, the designation terminates and the area may not be redesignated for a period of one year after the termination. Section 380.05(12).
The Act affects regulation of virtually all development in an area of critical state concern: all building, mining, and changes in the use or appearance of land, water and air and appurtenant structures; material increases in the density of its use; alteration of shores and banks; drilling; structural demolition; clearing adjunct to construction; and deposit of waste or fill. Excepted are work by road agencies and other utilities; structural maintenance affecting only the interior or the color or exterior decoration of a structure; the use of structures for customary dwelling purposes; changes of usage within the same regulated class of use; changes in ownership; and changes in rights of access, riparian rights, easements and covenants affecting rights and land. Section 380.04.
The controversy before us results from actions taken by the Administration Commission of the Department of Administration in designating the Green Swamp area of critical state concern and the Florida Keys area of critical state concern and, in the case of the former, adopting land development regulations.

Green Swamp Area of Critical State Concern.[7]
The Administration Commission adopted Chapter 22F-5, Florida Administrative Code, on July 16, 1974, which rule designated the Green Swamp area of critical state concern[8] and adopted principles for guiding development related thereto. After hearings on proposed land development regulations for the area, the Administration Commission on June 17, 1975, adopted amended land development regulations. Subsequent to that date a challenge to the land development regulations was filed but was denied by a hearing officer on June 27, 1975. On June 30, 1975, the land development regulations were filed with the Secretary of State as Chapters 22F-6 and 22F-7, Florida Administrative Code. However, it was brought to the attention of the Administration Commission that Section 120.54(11), Florida Statutes (1975), which provides that regulations are "effective" twenty days after they are filed, might preclude the land development regulations from becoming effective within twelve months of adoption of the rule designating the area of critical state concern as mandated by Section 380.05(12), Florida Statutes (1975). Apprehensive concerning the effect of Section 120.54(11) upon the efficacy of the regulations, the Administration Commission met on July 15, 1975, declared an emergency pursuant to Section 120.54(8)(a), Florida Statutes (1975), and approved land development regulations identical to Chapters 22F-6 and 22F-7. These regulations were filed as emergency rule Chapters 22 FER-75-1 through 30, Florida Administrative Code. Individual and corporate parties to the rulemaking proceedings petitioned the district court for review of the described final agency rulemaking action. Although the petitioners attacked the land development regulations on constitutional and several statutory grounds, the district court disposed of the *917 case on a single statutory issue and expressly reached none other. The court held that the emergency rules adopting the land development regulations were not effective because there was no demonstrated "immediate danger to the public health, safety, or welfare" as required by Section 120.54(8)(a). It concluded further that the land development regulations adopted as Chapters 22F-6 and 22F-7 did not become effective within the time imposed by Section 380.05(12) and, therefore, the designation made by Chapter 22F-5 terminated.
On petition for rehearing the Administration Commission raised for the first time the issue of the intervening rule challenge under Section 120.54(3). However, the court declined to consider the issue because of Florida Appellate Rule 3.14(b) and because of its decision in Cross Key Waterways, Inc. v. Askew, supra, holding unconstitutional the provision by Section 380.05(1) for designation of areas of critical state concern through use of the criteria stated in Section 380.05(2)(a) and (b). Thus, the fundamental constitutional ground avoided in the principal opinion was the basis for disposition of the case on rehearing.

Florida Keys Area of Critical State Concern.[9]
On March 3, 1975, the Division of State Planning issued its report to the Administration Commission recommending that a substantial portion of the Florida Keys be declared an area of critical state concern. The Administration Commission held a public meeting in Key West on March 28, 1975, to receive comment on the recommendation of the Division of State Planning. The meeting was conducted in accordance with Section 120.54, Florida Statutes (1975), related to rulemaking procedures, and revisions in the recommendation of the Division of State Planning were proposed. Subsequently, "issue papers" were prepared and submitted by the Division of State Planning in response to questions raised at the March 28, 1975, meeting. After an oral request that the proceedings held on March 28, 1975, be conducted in accordance with the provisions of Section 120.57, Florida Statutes (1975), on April 14, 1975, appellees filed a written petition requesting that further proceedings scheduled for the following day be conducted in the formal manner prescribed by Section 120.57. Appellees asserted that their substantial interests would be affected and that a rulemaking proceeding pursuant to Section 120.54 did not provide adequate opportunity to protect those interests. At the proceedings conducted on April 15, 1975, the petition for a Section 120.57 hearing was denied due to the purported failure of appellees to establish that proceedings pursuant to Section 120.54 were inadequate to protect their interests. At the close of this meeting, the Administration Commission approved the proposed rule designating virtually all of the Keys[10] as an area of critical state concern. On April 25, 1975, the rule designating the area of critical state concern together with accompanying principles for guiding development were filed with the Secretary of State and ultimately published as Chapter 22F-8, Florida Administrative Code.
Timely petitions for review of this agency action were lodged with the District Court of Appeal, First District, by appellees. In ruling upon a motion to dismiss, the district court confirmed the standing of appellees to seek review of the agency action.
As mentioned above the district court held that the Section 380.05(2)(a) and (b) standards for exercise of the Section 380.05(1) power to designate areas of critical state concern are inadequate and that the delegation consequently offends Article II, Section 3, Florida Constitution. Accordingly, the court quashed Rule 22F-8. However, *918 the district court expressly resolved all other issues raised, including the form of the proceedings, adversely to appellees.

The Consolidated Cases
While numerous issues are raised in these consolidated appeals we, like the District Court of Appeal, First District, find the issue of the constitutionality of the delegation of power to the Administration Commission to be dispositive. Therefore, except as otherwise herein expressly mentioned, we refrain from passing upon any other issues raised.
At contest here are the competing philosophies which underlie two provisions of our fundamental document of government and the attempt by the legislature to accommodate those philosophies through the enactment of Section 380.05(2)(a) and (b), Florida Statutes (1975). Article II, Section 7, Florida Constitution, enunciates the policy of the State to conserve and protect its natural resources and scenic beauty. Nonetheless, in implementing this policy due regard must be had for the admonition of Article II, Section 3, Florida Constitution:
Branches of government.  The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
Appellants urge two propositions upon us. First, that the provisions of Section 380.05(2)(a) and (b) set forth adequate criteria for exercise of the power delegated by Section 380.05(1) when measured against the case law which construes the operation of Article II, Section 3. This argument is bolstered by the decisions from this Court which recognize that the specificity of standards and guidelines may depend upon the subject matter dealt with and the degree of difficulty involved in articulating finite standards. See, e.g. Straughn v. K & K Land Management, Inc., 326 So.2d 421 (Fla. 1976); State Dept. of Citrus v. Griffin, 239 So.2d 577 (Fla. 1970). Second, it is asserted that the modern trend in administrative law is to relax the doctrine of unlawful delegation of legislative power in favor of an analysis which focuses upon the existence of procedural safeguards in the administrative process as opposed to standards enunciated by the legislature. See Butler v. United Cerebral Palsy of Northern Ky., Inc., 352 S.W.2d 203 (Ky. 1961); Warren v. Marion County, 353 P.2d 257 (Or. 1960); Barry and Barry, Inc. v. State of Washington Dept. of Motor Vehicles, 81 Wash.2d 155, 500 P.2d 540 (1972); Schmidt v. Dept. of Resource Development, 39 Wis.2d 46, 158 N.W.2d 306 (1968); K. Davis, Administrative Law of the Seventies, § 2.04, at 30 (1976). Appellants maintain that the broad statement of policy contained in Sections 380.05(1) and 380.05(2)(a) and (b) coupled with the administrative safeguards imposed by Chapter 120, Florida Statutes (1975), alleviates any objection that the Administration Commission will act arbitrarily or capriciously in performing the function assigned by the legislature.
Dealing with these propositions in the order presented, we first conclude that we must concur with the able opinion of the District Court of Appeal, First District, in Cross Key Waterways v. Askew insofar as it finds the standards and guidelines of Section 380.05(2)(a) and (b) to be deficient when assessed in light of prior case law. See D'Alemberte v. Anderson, 349 So.2d 164 (Fla. 1977); Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1977); Sarasota County v. Barg, 302 So.2d 737 (Fla. 1974); Conner v. Joe Hatton, Inc., 216 So.2d 209 (Fla. 1968); State v. Atlantic Coast Line Ry., 56 Fla. 617, 47 So. 969 (1908). A corollary of the doctrine of unlawful delegation is the availability of judicial review. In the final analysis it is the courts, upon a challenge to the exercise or nonexercise of administrative action, which must determine whether the administrative agency has performed consistently with the mandate of the legislature. When legislation is so lacking in guidelines that neither the agency nor the *919 courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law.
The criteria for designation of an area of critical state concern set forth in Section 380.05(2)(a) and (b) are constitutionally defective because they reposit in the Administration Commission the fundamental legislative task of determining which geographic areas and resources are in greatest need of protection. As pointed out by Judge Smith below, the procedure envisioned by Sections 380.05(1) and (2) makes it impossible for a reviewing court to ascertain whether the priorities recognized by the Administration Commission comport with the intent of the legislature:
The greater deficiency of Section 380.05(2), subsection (a), is that it does not establish or provide for establishing priorities or other means for identifying and choosing among the resources the Act is intended to preserve. That subsection lacks the specificity of the Big Cypress designation, the predictability of a legislatively approved comprehensive plan which confines subsection (c) criteria, the rule standards required for Section 380.10 identification of developments of regional impact, and any other standards for the necessary choice. The Act treats alike, as fungible goods, disparate categories of environmental, historical, natural and archaeological resources of regional or statewide importance and all of Florida's manifold resources within those vast categories. Up to the acreage limit, the Commission is empowered to supersede as it chooses the local governments regulating development in historic Pensacola or St. Augustine, or at the shores of the Atlantic and Gulf of Mexico to a depth of a thousand feet, or in all acreage on the Suwannee and St. Johns and their tributaries or, indeed, in all the Florida Keys. If Cedar Key, Ybor City, Palm Beach and the path of the King's Road are found to be historic resources of satisfactory importance, they too may be designated. Subsection (a) reaches beyond those areas to include, as similarly eligible for designation, areas which for unstated reasons "impact" valued resources elsewhere. Subsection (b) expands the choice to include areas which in unstated ways affect or are affected by any "major public facility" which is defined in Section 380.031(10), or any "major public investment," which is not.
351 So.2d at 1069 (footnotes omitted).
We emphasize that it is not the legislature's use of the phrases "containing, or having a significant impact upon, environmental, historical, natural, or archaeological resources of regional impact" nor "significantly affected by, or having a significant effect upon, an existing or proposed major public facility or other area of major public investment" which faults the legislation. Although the Court in Sarasota County v. Barg, supra, invalidated an act which utilized the terms "undue or unreasonable" dredging or filling and "unreasonable" destruction of natural vegetation in a manner which would be "harmful or significantly contribute" to air and water pollution, such quantitative assessments by an administrative agency are not necessarily prohibited. As suggested by the district court of appeal such "approximations of the threshold of legislative concern" are not only a practical necessity in legislation, but they are now amenable to articulation and refinement by policy statements adopted as rules under the 1974 Administrative Procedure Act, Chapter 120, Florida Statutes. The benefits of the current version of Chapter 120 were not available at the time of the Barg decision. The deficiency in the legislation here considered is the absence of legislative delineation of priorities among competing areas and resources which require protection in the State interest.
We are told by appellants that the standards in Section 380.05(2)(a) and (b) are no *920 less definite than the guidelines of Sections 501.204 and 501.205, Florida Statutes (1975), which were upheld against a similar constitutional attack in Dept. of Legal Affairs v. Rogers, 329 So.2d 257 (Fla. 1976). The sections in question made unlawful "unfair ... acts or practices in the conduct of any trade or commerce" and provided for the adoption by the cabinet of "rules . . which prohibit with specificity acts or practices that violate this part ..." However, the legislation in question contained the admonition that in construing the Act great weight and consideration should be given to the interpretation of similar terms in the Federal Trade Commission Act [15 U.S.C. § 45(a)(1)] by the Federal Trade Commission and the federal courts. Furthermore, the rules promulgated by the cabinet are required to be consistent with the rules, regulations, and decisions of the Federal Trade Commission and the federal courts in interpreting the provisions of the federal act. Appellants stress the language of Mr. Justice England's concurring opinion, in which this author joined, that:
[F]lorida's declaration of commercial policy need not be made rigid to the point of ineffectiveness, but may be "fleshed out" by administrative action to meet changing circumstances within our borders.
329 So.2d at 269.
However, for an administrative agency to "flesh out" an articulated legislative policy is far different from that agency making the initial determination of what policy should be. In the cases under review the Administration Commission has in fact exercised the policy role in the first instance of determining which areas of this State and the resources therein are of critical state concern. It has then proceeded, pursuant to the other provisions of Section 380.05, to promulgate principles for guiding development and to adopt or approve land development regulations. Under the provisions of Section 380.05, the Administration Commission "fleshes out" what it has in the first instance conceived. In the words of Justice Whitfield in State v. Atlantic Coast Line Ry., supra, the function of the Administration Commission under Section 380.05(1) and (2)(a) and (b) involves the exercise of primary and independent discretion rather than the determination "within defined limits, and subject to review, [of] some fact upon which the law by its own terms operates... ." 47 So. at 972. In contrast, by The Big Cypress Conservation Act of 1973, Section 380.055, Florida Statutes (1975), the legislature conceived the areas of critical state concern and left to the Division of State Planning and the Administration Commission the task of "fleshing out" through adoption of land development regulations.
Our research in other jurisdictions fails to disclose one instance in which the legislative branch has unconditionally delegated to an agency of the executive branch the policy function of designating the geographic area of concern which will be subject to land development regulation by the agency. For example, in CEEED v. California Coastal Zone Conservation Commission, 43 Cal. App.3d 306, 118 Cal. Rptr. 315 (Dist.Ct. App. 1974), the California court sustained against an unlawful delegation attack broad powers of regional commissions to issue development permits within the California coastal zone designated by the Coastal Conservation Act of 1972. Any development in the designated coastal area was subject to permitting by an appropriate regional commission pending formulation and submission for adoption by the legislature of a comprehensive California Coastal Zone Conservation Plan. The court approved the standard in the Act, which required a finding before permitting, that "... the development will not have any substantial adverse environmental or ecological effect" and that "... the development is consistent with, the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302." It dealt with the delegation issue in the following language:
The constitutional doctrine prohibiting delegation of legislative power rests on the premise that the Legislature may not abdicate its responsibility to resolve the *921 "truly fundamental issues" by delegating that function to others or by failing to provide adequate directions for the implementation of its declared policies. (Citations omitted) Consequently, where the Legislature makes the fundamental policy decision and delegates to some other body the task of implementing that policy under adequate safeguards, there is no violation of the doctrine. (Citations omitted)
* * * * * *
The "substantial adverse environmental or ecological effect" standard is more specific than the broad "health, safety, or general welfare" guideline upheld in Candlestick and the cases cited above. [Candlestick Properties, Inc. v. San Francisco Bay CND Commission, 11 Cal. App.3d 557, 89 Cal. Rptr. 897 (Dist.Ct.App. 1970)]. Although application of the standard calls for the exercise of judgment and discretion, by the very nature of the legislative goals, considerable discretion must of necessity be vested in the Commission. As the court in Friends of Mammoth v. Board of Supervisors, 8 Cal.3d 247, 271, 104 Cal. Rptr. 761, 777, 502 P.2d 1049, 1065, said of the "significant effect on the environment" phrase in the California Environmental Quality Act: To some extent this is inevitable in a statute which deals, as the EQA must, with questions of degree." The statutory criteria to be observed by the Commission and the regional commissions in carrying out the tasks delegated to them clearly satisfy constitutional requirements. The fact that the Commission is required to weigh complex factors in determining whether a development will have a substantial adverse environmental or ecological effect does not, as plaintiffs charge, mean that unbridled discretion has been conferred on it. A statute empowering an administrative agency to exercise a judgment of a high order in implementing legislative policy does not confer unrestricted powers. (Citations omitted)
118 Cal. Rptr. at 329-330.
The language of the California court is not dissimilar to that used by Justice Whitfield in State v. Atlantic Coast Line Ry., supra. However, the striking difference between the California Act and the statutory scheme here under consideration lies in the fact that the California Act geographically circumscribed by its own terms both the coastal zone and the area within the coastal zone within which the regional commissions were authorized to require development permitting. Furthermore, the permitting function was an interim measure pending adoption by the legislature of a comprehensive Coastal Zone Conservation Plan.
In J.M. Mills, Inc. v. Murphy, 116 R.I. 54, 352 A.2d 661 (1976), the Rhode Island Supreme Court dealt with the validity of the Fresh Water Wetlands Act. The Act provides for regulation of all fresh water wetlands. The Act defines its geographical jurisdiction, declares the state policy with regard to wetlands, and requires the approval of both the Director of the Department of Natural Resources and the municipality in which the land is located before wetlands may be altered. Plaintiff landowner sought a declaratory judgment challenging the functions vested in the Director and the municipalities as being an unlawful delegation of legislative power. On appeal by the plaintiff from an adverse decision in the trial court, the supreme court affirmed. After noting that the nondelegation doctrine has been relaxed of late, the court reasoned that the adequacy of legislative standards could best be measured against the intended purpose of the legislation. Having enunciated these general principles the court stated:
With these general principles in mind, we proceed to consider the validity of a delegation of authority to the director of the Department of Natural Resources to disapprove applications to alter fresh water wetlands. Section 2-1-21 requires anyone who would alter the character of a wetland to obtain the approval of the director and fixes the governing standard as the "best public interest." The plaintiffs *922 argue that this is not a meaningful standard. In response to this contention, we first note that the director is given jurisdiction over only a very limited area, wetlands. The term "wetlands" is precisely defined in 2-1-20. In a previous case where this court found a valid delegation of authority to the Blackstone Valley Sewer District Commission, City of Central Falls v. Halloran, 94 R.I. 189, 179 A.2d 570 (1962), we placed great weight on the fact that the administrative agency was given discretion to act only in a well-defined geographical area. Here, also, the scope of administrative authority is clearly confined.
352 A.2d at 666 (emphasis supplied).
It is apparent that the Rhode Island court was materially influenced by the fact that the administrative agency was granted discretion to act only in a geographical area well-defined by the legislature.
To the same effect is the case of Toms River Affiliates v. Dept. of Environmental Protection, 140 N.J. Super. 135, 355 A.2d 679 (1976), upholding against constitutional attack the New Jersey Coastal Area Facility Review Act. The Act establishes boundaries for the "coastal area" of the state and declares that this area constitutes "an exceptional, unique, irreplaceable and delicately balanced physical, chemical and biologically acting and interacting natural environmental resource... ." The State Department of Environmental Protection is designated as the agency to administer the Act and is granted authority to adopt rules and regulations to effectuate its purposes. After declaring the purposes of the legislation, the Act proceeds to list the facilities subject to its provisions. In denying the challenge that the Act does not provide adequate standards for its administration, the New Jersey court approved some rather nonspecific standards when coupled with procedural safeguards designed to insure against unreasonable and unwarranted administrative action. Nonetheless, the geographic area to be regulated by the administrative agency was discreetly defined by the Act.
In 1974, Massachusetts enacted St. 1974, c. 637, "An act protecting land and water on Martha's Vineyard" which is patterned after The American Law Institute, Model Land Development Code. ALI, A Model Land Development Code, Art. 7 (1976). Section 380.05, Florida Statutes (1975), was likewise modeled after an earlier draft of Article 7 of the American Law Institute Model Code. The Martha's Vineyard Act was the subject of litigation in Island Properties, Inc. v. Martha's Vineyard Commission, 361 N.E.2d 385 (Mass. 1977). The test in this case did not touch upon the subject of unlawful delegation and, therefore, the decision is not persuasive in the instant cases. It is instructive to note, however, that in implementing the ALI model code the Massachusetts legislature expressly delineated the geographical area of Martha's Vineyard within which the Martha's Vineyard Commission is authorized to designate districts of critical planning concern. Under the terms of the Massachusetts act the commission was charged with developing standards and criteria for identification of areas of critical planning concern within the boundaries of the island, which standards and criteria were subject to and received the approval of the Secretary of Communities and Development. The Massachusetts scheme, then, is similar to that adopted by the Florida Legislature for the "Big Cypress Area" (Section 380.055) insofar as establishment of the geographic perimeters in which the agency may exercise its discretion is concerned.
The second prong of appellants' argument is based upon a thesis for delegation of legislative power developed and espoused by Professor Kenneth Culp Davis of the University of Chicago College of Law. See Davis, Administrative Law of the Seventies, supra. Professor Davis maintains that there should be a shift in emphasis from legislatively imposed standards for administrative action to procedural safeguards in the administrative process. He supports his *923 rationale by citation to federal decisions as well as decisions from a minority of state court jurisdictions. His premises are that (1) strict adherence to the nondelegation doctrine would stultify the administrative process; (2) the doctrine, in fact, has been used as a label to invalidate legislation of which courts disapprove without any rational distinction between standards approved and those disapproved; and (3) the danger of arbitrary or capricious administrative action is best met through procedural due process safeguards in the administrative process.
The Davis view is probably best demonstrated in the case of Barry & Barry, Inc. v. State of Washington, Dept. of Motor Vehicles, supra, wherein the Washington court stated:
We are convinced and have no hesitancy in saying that the strict requirement of exact legislative standards for the exercise of administrative authority has ceased to serve any valid purpose. In addition to lacking purpose, the doctrine in several respects impedes efficient government and conflicts with the public interest in administrative efficiency in a complex modern society.
* * * * * *
Second, requiring the legislature to lay down exact and precise standards for the exercise of administrative authority destroys needed flexibility....
Finally, a strictly construed standards doctrine is logically unsound and legally meaningless. The needs and demands of modern government require the delegation of legislative power without specific guiding standards ... We think that it is time to abandon the notion that the presence or absence of vague verbalisms like "public interest" or "just and reasonable" make all the difference between valid legislation and unlawful delegation.
500 P.2d 540, at 543 (emphasis in original).
The court went on to say that the focus should be on administrative safeguards and administrative standards. Relying upon United States Supreme Court decisions in reaching its result, the court concluded that the Washington constitution requires no different result than that reached under the United States Constitution:
It may be argued that whatever the freedom of the federal courts to ignore the requirement of precise legislative standards for delegated authority, its continued existence is mandated in the state of Washington by Const. art. 2, § 1 (amendment 7), which provides that "[t]he legislative authority of the state of Washington shall be vested in the legislature ..." However, there is a similar provision in U.S.Const. art. 1, § 1: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States ..." The Supreme Court of the United States has not regarded this provision as prohibitory in upholding the delegations of legislative authority without meaningful standards in the above-mentioned decisions in American Trucking Associations [American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967)], and Southwestern Cable Co. [U.S. v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)].
In our judgment, these provisions of the Washington State and United States constitutions mean only that legislative power is delegated initially and fundamentally to the legislative bodies. We believe that one of the legislative powers granted by these provisions is the power to determine the amount of discretion an administrative agency should exercise in carrying out the duties granted to it by the legislature. To construe these provisions as confining the exercise of legislative power to the legislative bodies, would be to read them as limitations of power rather than as grants of power. We may assume that if the framers had intended *924 to so limit the power of the legislative bodies, they would have done so expressly, rather than by implication.
500 P.2d at 544 (emphasis in original).
It should be noted that Article II, Section 3, Florida Constitution, contrary to the Constitutions of the United States and the State of Washington, does by its second sentence contain an express limitation upon the exercise by a member of one branch of any powers appertaining to either of the other branches of government. While other jurisdictions which subscribe to the Davis thesis[11] have constitutional provisions similar to Article II, Section 3, Florida Constitution, the precise issue of the meaning of the limiting language is not discussed.
Although the Davis view is an entirely reasonable one as demonstrated by its adoption in the federal courts and a minority of state jurisdictions, nonetheless, it clearly has not been the view in Florida. See Davis, Administrative Law of the Seventies, supra, at 32. Should this Court, then, accept the invitation of appellants to abandon the doctrine of nondelegation of legislative power which is not only firmly embedded in our law, but which has been so continuously and recently applied? See, e.g., D'Alemberte v. Anderson, Lewis v. Bank of Pasco County, supra. We believe stare decisis and reason dictate that we not.
Regardless of the criticism of the courts' application of the doctrine, we nevertheless conclude that it represents a recognition of the express limitation contained in the second sentence of Article II, Section 3 of our Constitution. Under the fundamental document adopted and several times ratified by the citizens of this State, the legislature is not free to redelegate to an administrative body so much of its lawmaking power as it may deem expedient. And that is at the crux of the issue before us. Appellants argue that Section 380.05 requires that all land development regulations be consistent with the principles for guiding development which are adopted contemporaneously with the designation of an area of critical state concern and, therefore, there can be no abuse in the process. We concur that the provisions of Section 380.05 coupled with Chapter 120, Florida Statutes, are calculated to assure procedural due process. Nonetheless, the standard by which land development regulations are to be measured is not a standard articulated by the legislature but one determined by the Administration Commission through formulation of principles for guiding development. In short the primary policy decision of the area of critical state concern to be designated as well as the principles for guiding development in that area are the sole province of an administrative body. From that determination all else follows. This does not comport with the dictates of State v. Atlantic Coast Line Ry. Co., supra, and its progeny. Flexibility by an administrative agency to administer a legislatively articulated policy is essential to meet the complexities of our modern society, but flexibility in administration of a legislative program is essentially different from reposing in an administrative body the power to establish fundamental policy.
In our consideration of this issue, we have not overlooked the decision of the United States Supreme Court in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), cited by appellants as supplemental authority. This decision deals with the designation of Grand Central Terminal as a "landmark" by the Landmarks Preservation Commission under New York City's Landmarks Preservation Law. Neither in the state courts nor in the United States Supreme Court was the issue of unlawful delegation raised or considered. The issues decided were whether the application of the Landmarks Preservation Law had taken the owners' property without just compensation in violation of the Fifth and Fourteenth Amendments and arbitrarily deprived them *925 of their property without Due Process of Law in violation of the Fourteenth Amendment. Hence, the Penn Central case is inapposite.
It is submitted by appellants that the provisions of Section 11.60(2)(i), Florida Statutes (1977), will cure any lack of adequate standards or guidelines in the subject legislation. By Section 11.60(2)(i), the joint Administrative Procedures Committee of the legislature is given standing to seek review in the courts of this State of the validity or invalidity of any administrative rule. However, this offers no panacea because the ability of the committee to maintain proceedings for review of a rule does not make binding upon the courts the view asserted by the committee. It is still necessary for the court to measure the validity or invalidity of the administrative action against the standards and guidelines articulated in the legislation under which the agency acts.
Accordingly, until the provisions of Article II, Section 3 of the Florida Constitution are altered by the people we deem the doctrine of nondelegation of legislative power to be viable in this State. Under this doctrine fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks, and administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program. The criteria contained in Section 380.05(2)(a) and (b), Florida Statutes (1975), do not comply with this constitutional imperative.
Our decision today need not impair the ability of our state government to protect the resources and facilities described in Section 380.05(2)(a) and (b), however. In complying with the policy and mandate of Article II, Section 7, Florida Constitution, the legislature need only exercise its constitutional prerogative and duty to identify and designate those resources and facilities. It may be done in advance as with the Big Cypress area of critical state concern, Section 380.055, Florida Statutes (1975), or through ratification of administratively developed recommendations as in the case of the California Coastal Zone Conservation Plan, CEEED v. California Coastal Zone Conservation Commission, supra. In either case the ultimate selection of priorities for areas of critical state or regional concern will rest with representatives of our government charged with such responsibilities under our Constitution.
The decisions of the District Court of Appeal, First District, are affirmed.
It is so ordered.
ADKINS, BOYD, HATCHETT and ALDERMAN, JJ., concur.
ENGLAND, C.J., concurs with an opinion, with which ADKINS, J., concurs.
OVERTON, J., concurs in result only.
ENGLAND, Chief Justice, concurring.
I sincerely hope that the significance of our decision today is not lost in a debate concerning its effect on the Environmental Land and Water Management Act. Justice Sundberg has revitalized a vastly more important doctrine  one that guarantees that Florida's government will continue to operate only by consent of the governed. He is saying, quite simply, that whatever may be the governmental predilections elsewhere, in Florida no person in one branch of our government may by accident or by assignment act in a role assigned by the Constitution to persons in another branch.
Law giving, the power involved here, is a responsibility assigned to the legislature, and that body is prohibited from relegating its responsibility wholesale to persons, whether elected or appointed, whose duties are simply to see that the laws are observed. The people of Florida placed that restraint on the legislature, as they had *926 every right to do.[1] People in other states may not restrict their public officials to this extent, but their authority to do so, and the effect of their doing so, are readily acknowledged even in states without a similar constitutional limitation. For example, in Barry and Barry, Inc. v. State Department of Motor Vehicles, 500 P.2d 540, 544 (Wash. 1972), the court commented on the provision in Washington's Constitution which, like the first sentence of Article II, Section 2 of our Constitution, merely assigns legislative power to the legislature:
To construe these provisions as confining the exercise of legislative power to the legislative bodies, would be to read them as limitations of power rather than as grants of power. We may assume that if the framers had intended to so limit the power of the legislative bodies, they would have done so expressly, rather than by implication.
What was not done in Washington is precisely what has been done in Florida.
In my opinion, Florida's unique constitutional directive that governmental powers should not be aggregated in one branch, by usurpation, inadvertence or knowing delegation, experiences a refreshing resurgence from Justice Sundberg's opinion.
ADKINS, J., concurs.

ON PETITION FOR REHEARING OR CLARIFICATION
SUNDBERG, Justice.
Appellants have filed in this cause a petition for rehearing or clarification of the Court's principal opinion [372 So.2d 913] filed November 22, 1978. It is asserted that certain language in the opinion may result in unduly circumscribing the legislature in its response to the invalidation of portions of section 380.05, Florida Statutes (1975). The portion of the opinion allegedly giving rise to the appellants' concerns is:
[T]he legislature need only exercise its constitutional prerogative and duty to identify and designate those resources and facilities. It may be done in advance as with the Big Cypress area of critical state concern, Section 380.055, Florida Statutes (1975), or through ratification of administratively developed recommendations... .
At 925.
Appellants maintain that the quoted language can be construed to limit the legislature to the two alternatives suggested in its attempt to devise legislation to protect and conserve our natural resources while not violating the separation of powers doctrine.
Because of the significance of this issue, we deem it appropriate, in this instance, to disavow the construction attributed by appellants to the above-quoted language. The examples outlined in the opinion present obvious remedies for the deficiencies found in section 380.05; however, it was not our purpose to indicate that the alternatives stated are exclusive.
Accordingly, the petition for rehearing is denied.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, SUNDBERG, HATCHETT and ALDERMAN, JJ., concur.
NOTES
[1] Cross Key Waterways v. Askew, 351 So.2d 1062 (Fla. 1st DCA 1977); Postal Colony Co., Inc. v. Askew, 348 So.2d 338 (Fla. 1st DCA 1977).
[2] Art. II, § 7, Fla. Const., reads:

"Natural resources and scenic beauty.  It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise."
[3] For the purpose of clarity, we will refer to the 1975 version of the enactment, which version is similar in all material respects to its 1972 counterpart.
[4] Art. IV, § 4, Fla. Const.; §§ 20.03(1), 20.31(2), Fla. Stat. (1975).
[5] Except as may be otherwise specified, the 1975 version of Ch. 120 is applicable to the proceedings with respect to these consolidated cases.
[6] § 120.041(4), Fla. Stat. (1973), the "old APA" provided that a rule is effective the day following the date it is filed.
[7] Askew v. Postal Colony Co., Inc., supra.
[8] Composed of 322,690 acres in Polk and Lake Counties.
[9] Askew v. Cross Key Waterways, supra.
[10] "All lands in Monroe County, except: (1) that portion ... included within ... the Everglades National Park and areas north of said Park; [and] (2) all lands seaward of mean high water that are owned by local, state, or federal governments." Ch. 22F-8, Fla. Admin. Code.
[11] See text of opinion, p. 922, supra.
[1] E.g., In re Apportionment Law Senate Joint Resolution Number 1305, 263 So.2d 797, 805 (Fla. 1972); Monington v. Turner, 251 So.2d 872, 875 (Fla. 1971); State ex rel. Collier Land Investment Corp. v. Dickinson, 188 So.2d 781, 783 (Fla. 1966).