EHRLICH, Chief Justice,
concurring specially.
I generally concur with the majority opinion and the result it reaches. I write only to express my disagreement with the definition of “viability” adopted by the majority and to elucidate my views.
I wholeheartedly concur that Florida’s express constitutional right of privacy, article I, section 23, Florida Constitution, is implicated in this ease. Specifically, I note that the privacy provision was added to the Florida Constitution by amendment in 1980, well after the decision of the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). It can therefore be presumed that the public was aware that the right to an abortion was included under the federal constitutional right of privacy and would therefore certainly be covered by the Florida privacy amendment. See Jenkins v. State, 385 So.2d 1356 (Fla.1980). As expressed by the majority, it is also clear that the right of privacy extends to minors. See at 1192-1193.
It is therefore necessary for us to decide whether the state has a compelling interest sufficient to outweigh the minor girl’s right of privacy, and if so, whether this statute is the least intrusive means of furthering that compelling interest. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985). I agree that the state does not have a compelling interest sufficient to support the statute in this case, and even if the state’s interest were compelling, I believe this statute is not the least intrusive means of furthering any such interest.
I recognize, as does the majority, that the state has legitimate interests in any restrictions on the ability to obtain an abortion: protecting the health of the mother and protecting the potential life represented by the fetus. As these interests exist throughout pregnancy, see City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 428-30, 103 S.Ct. 2481, 2491-93, 76 L.Ed.2d 687 (1983), the question becomes at what point, if ever, they become compelling so as to outweigh the privacy rights of the individual under article I, section 23.
As to the first state interest, protecting the health of the mother, I agree that we should adopt the United States Supreme Court’s analysis: The state’s interest in the health of the mother does not become compelling until the point when the abortion procedure becomes equally or more dangerous for the mother than childbirth. Roe, 410 U.S. at 149-50, 93 S.Ct. at 724-25. The Court in Roe identified this point, based on available medical evidence, as approximately at the end of the first trimester. Id. at 163, 93 S.Ct. at 731. Because of advances in medical technology, the specific point at which the state’s interest in the health of the mother becomes compelling has become less definite, and may have been extended into the second trimester. City of Akron, 462 U.S. at 429 n. 11, 103 S.Ct. at 2492 n. 11. Once the state’s interest in the health of the mother becomes compelling, the state may regulate the abortion procedure in the least restrictive ways that are reasonably related to furthering that state interest. As the Court noted in City of Akron, however, “[t]his does not mean that a State never may enact a regulation touching on the woman’s abortion right during the first weeks of pregnancy. Certain regulations that have no significant impact on the woman’s exercise of her right may be permissible where' justified by important state health objectives.” Id. at 430, 103 S.Ct. at 2492. Examples of regulations permissible during the first trimester are requiring informed consent and the maintenance of certain records. See Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Therefore, to the extent that section 390.001(4), Florida Statutes (Supp.1988), requires the informed consent of the pregnant woman (adult or minor) it serves a valid purpose. However, I do not believe that this interest can support the parental consent portion of the statute, section 390.001(4)(a), given the fact that the girl is considered competent to give consent to any other medical procedure related to her pregnancy as though she were an adult. § 743.065, Fla.Stat. (1987).
*1198 With regard to the state’s interest in-potential life, I believe that this Court is not in a position to radically alter the traditional legal view that the unborn are not legal “persons” and decide an issue on which there is no social, religious, philosophical, or scientific consensus, i.e., when life begins. However, the mother’s privacy rights cannot be considered in a vacuum. Even though the fetus is not a legal “person,” it is a potential life in which the state has an important interest. As the Court noted in Roe:
The pregnant woman cannot be isolated in her privacy. She carries an embryo and, later, a fetus.... The situation therefore is inherently different from marital intimacy, or bedroom possession of obscene material, or marriage, or procreation, or education, with which Eisenstadt [v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)] and Griswold [v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)], Stanley [v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ], Loving [v. Com. of Va., 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ], Skinner [v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ] and Pierce [v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ] and Meyer [v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ] were respectively concerned.... The woman’s privacy is no longer sole and any right of privacy she possesses must be measured accordingly.
Roe, 410 U.S. at 159, 93 S.Ct. at 730. Therefore, as an essential part of our discussion of the mother’s right of privacy guaranteed by the Florida Constitution, we must consider the point at which a line can be drawn separating the time in the pregnancy when the mother’s privacy right controls, and the time when the state’s interest in the potential life represented by the fetus becomes “compelling” so as to outweigh that privacy right.
The Roe definition of “viability” (i.e., when the fetus is “potentially able to live outside the mother’s womb, albeit with artificial aid,” 410 U.S. at 160, 93 S.Ct. at 730, because at that point the fetus “presumably has the capability of meaningful life outside the mother’s womb,” id. at 163, 93 S.Ct. at 731) and that adopted by the majority (“when the fetus becomes capable of meaningful life outside the womb through standard medical measures,” at 1194) do not seem to me to be significantly different. The Roe definition allows the use of any medical technology that could allow the fetus to develop to live a meaningful life outside the mother’s womb. Once we accept that the point of “viability” is that point at which some type of medical technology may be used, I frankly do not understand how or why we would differentiate between different medical measures, whether currently considered “standard” or “extraordinary,” as long as they enable the fetus to survive outside the womb and develop to live a meaningful life. Further, the majority’s definition, although limited to “standard medical measures,” will ultimately reach the same result because what is considered extraordinary today may be standard tomorrow.
I would prefer to adopt the definition of “viability” as set forth in Roe. Unlike the United States Supreme Court in Roe, we have no record before us, no medical evidence, which would allow us to fashion a new definition at this time, or to determine at what point in gestation a fetus would be “viable” under that new definition. However, I concur because this case involves a pregnancy that had not yet reached the point of “viability” under either definition, and further, because this statute places significant restrictions on the ability of minors to obtain an abortion at any time during pregnancy, not just after the point of “viability.”
I recognize that in cases involving minors, the state has an additional interest in protecting the immature minor and the integrity of the family. I agree, however, that in light of section 743.065 the state’s interest in the parental consent statute is not compelling.[1] Section 743.065 expressly *1199 grants to a pregnant, unwed minor the ability to consent, as though she were an adult, to medical services relating to pregnancy, except abortion, and to medical services for her child after birth. Decisions relating to the medical services covered under section 743.065 do not differ qualitatively from the decision to have an abortion. For example, under section 743.065, the pregnant minor girl may refuse to consent to medical treatment even though she is informed that without such treatment the fetus will not survive to term. At the heart of that situation, as with abortion, is a decision involving the life or death of the fetus. Yet under this statutory scheme, the minor girl is considered competent to make one decision but not the other. Given this statutory scheme, I must agree that the state has failed to prove that its interest in protecting the immature minor is compelling so as to outweigh the privacy rights of the minor girl.[2]
I also agree that even if the state had a compelling interest sufficient to support this statute, this statute also fails the second prong of the Winfield standard, i.e., it is not the least restrictive means of furthering the state’s interest. As the United States Supreme Court noted in Bellotti v. Baird, 443 U.S. 622, 644, 99 S.Ct. 3035, 3048, 61 L.Ed.2d 797 (1979), “the [judicial alternative] procedure must ensure that the provision requiring parental consent does not in fact amount to the ‘absolute, and possibly arbitrary, veto’ that was found impermissible in Danforth ” but must “provide an effective opportunity for an abortion to be obtained.”
Section 390.001(4)(a) provides for neither a record hearing nor the appointment of counsel for the minor. It only provides that “[a]t its discretion, the court may enter its order ex parte,” but must rule within forty-eight hours after the filing of the petition. Indeed, the statute, and our rules implementing it, seem to specifically contemplate that a hearing may not be necessary.[3] See Fla.R.Civ.P. 1.612(c) {“If the court requires a hearing, it shall be held expeditiously.”). By contrast, the Missouri consent statute upheld in Planned Parenthood Ass’n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), provided for a hearing on the record, where
the court shall hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature, possible consequences, and alternatives to the abortion; and any other evidence that the court may find useful in determining whether the minor should be granted majority rights for the purpose of consenting to the abortion or whether the abortion is in the best interests of the minor.
Id. at 479 n. 4, 103 S.Ct. at 2519 n. 4. The Missouri statute also provided for appointment of counsel for the minor if she did not *1200 have private counsel.[4] As the district court below noted, “[t]he procedure established by the [Missouri] statute insured that the court would hold a meaningful hearing and render a deliberative, informed and responsible decision, thus guarding against the possibility of an arbitrary determination.” In re T. W., 543 So.2d 837, 840-41 (Fla. 5th DCA 1989). As the majority recognizes, “[without a record, the appellate court will be unable to determine whether the denial was lawful or was simply based on the trial judge’s moral, religious, or political - beliefs.” At 1196. Further, I seriously question whether an adequate determination of the maturity of a minor can ever be made from cold pleadings, which is permitted under the Florida statute. Because of these significant defects noted by the majority, the Florida judicial alternative procedure does not sufficiently protect against arbitrary decisionmaking.' Therefore, it cannot be said to be .the least intrusive means of achieving the state’s goal.
As a final point, although I would not find the statute so vague as to violate due process under the United States or Florida Constitutions,[5] I would find that the provision constitutes an unconstitutional delegation of legislative authority to the judiciary.
The emergency rule of this Court implementing section 390.001(4)(a) states: “If no judgment is entered within the time period, the petition shall be deemed granted and the clerk shall place a certificate to this effect in the file.” Fla.R.Civ.P. 1.612(d) (emphasis added). See also Fla.R.App.P. 9.110(1). Section 390.001(4)(a) itself does not specify what action should be taken in the event no ruling is made within forty-eight hours. Article II, section 3, of the Florida Constitution, provides:
Branches of government. — The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
In Askew v. Cross Key Waterways, 372 So.2d 913 (Fla.1978), we recognized that the second sentence of this provision incorporated into the constitution the doctrine of nondelegation.
Under the fundamental document adopted and several times ratified by the citizens of this State, the legislature is not free to redelegate ... so much of its lawmaking power as it may deem expedient. ...
... Under this doctrine fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks, and administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program.
Id. at 924-25. I believe the question of whether, when a petition is not ruled on within the required time, it should be presumed granted or denied, is a matter of fundamental policy which must be decided by the legislature. The Court, pursuant to its rulemaking power, cannot make such policy. By failing to provide adequate guidelines in this respect, and thereby leaving it up to this Court to determine the effect of the trial court’s failure to rule within forty-eight hours, the legislature has unconstitutionally delegated a fundamental policy decision to this Court.
The Supreme Judicial Court of Massachusetts described the right of privacy as “an expression of the sanctity of individual *1201 free choice and self-determination as fundamental constituents of life.” Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 742, 370 N.E.2d 417, 426 (1977). That right is expressly guaranteed to the citizens of Florida by article I, section 23, of the Florida Constitution, and it is for this Court to ensure that that right is adequately protected. In my opinion, article I, section 23.is implicated by the significant restriction in section 390.-001(4)(a) on the ability of a minor to obtain an abortion at any time during her pregnancy. The statutory scheme before us evidences the limited nature of the state’s interest in this legislation, such that it cannot outweigh the privacy rights of the minor girl, nor is it the least intrusive means of furthering any such interest. I agree that section 390.001(4)(a), Florida Statutes (Supp.1988), is violative of article I, section 23, of the Florida Constitution, and I therefore concur.

. Where fundamental rights are involved, the United States Supreme Court has expressly and *1199 repeatedly held that state restrictions on those rights must be supported by a "compelling state interest." Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). The majority assumes that a standard less than “compelling” is being applied to minors by that Court because the Court describes the state’s interests relative to minors as “significant," and later determines that those interests are sufficient to outweigh the privacy rights of the minor. See at 1194. However, the Court never expressly states that proposition. Therefore, it is equally valid to conclude that because the state's interests relative to minors are sufficient to outweigh the minor’s privacy rights, those interests must also be “compelling” in those circumstances. The term "significant” may be merely descriptive, as are the terms “important” and "legitimate,” which the Court has also used to describe state interests in abortion regulations. See, e.g., Roe, 410 U.S. at 163, 93 S.Ct. at 731.

. Justice McDonald raises the concern in his opinion that "any person performing an abortion on a minor without a statutorily authorized or parental consent is guilty of committing a battery and is subject to both civil and criminal penalties.” At 1205 n. 3 (McDonald, J., dissenting). Section 743.065, Florida Statutes (1987), will provide that statutory authorization in light of the fact that by this decision the only excep-_ tion to section 743.065, section 390.001(4)(a), is being declared unconstitutional.

, For this reason, I do not believe that the lack of a requirement of a hearing may be cured by rule of this Court, even if arguably the lack of any provision for appointment of counsel or a record of such a hearing could be cured by rule.

. Missouri Revised Statute § 188.028 (Supp. 1982) (requiring parental consent or judicial consent), at issue in Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), provided that "if the minor does not have private counsel ... the court should appoint counsel” and required "[a] hearing on the merits of the petition, to be held on the record." Id. at 479 n. 4, 103 S.Ct. at 2519 n. 4. (emphasis added).

. The trial court and the district court also found the statute unconstitutionally vague because it gives no guidance as to what constitutes "maturity." I disagree. This language is straight out of the United States Supreme Court opinions on this issue. See Ashcroft, 462 U.S. at 491, 103 S.Ct. at 2525. Further, this type of decision is one that judges are frequently called on to make (e.g., competency, best interests of a child, etc.).