432 So.2d 592 (1983)
SOUTHEAST VOLUSIA HOSPITAL DISTRICT, et al., Appellants,
v.
STATE of Florida, DEPARTMENT OF INSURANCE, and Florida Patient's Compensation Fund, Appellees.
HIGHLANDS COUNTY HOSPITAL DISTRICT, et al., Appellants,
v.
STATE of Florida, DEPARTMENT OF INSURANCE, and Florida Patient's Compensation Fund, Appellees.
Nos. AN-412, AN-367.
District Court of Appeal of Florida, First District.
May 17, 1983.
Rehearing Denied May 27, 1983.
*593 Ben H. Wilkinson, Neil H. Butler, and Cathi C. O'Halloran of Pennington, Wilkinson, Gary & Dunlap, Tallahassee, and Adams, Hill & Fulford, Orlando, for appellants Southeast Volusia Hosp. Dist., et al.
Peter J. Winders and Jacob D. Varn of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., and John D. Buchanan, Jr., of Henry, Buchanan, Mick & English, Tallahassee, and Adams, Ward, Hunter, Angones & Adams, Miami, for appellants Highlands County Hosp. Dist., et al.
Richard B. Collins and Sam R. Neel, III, of Perkins & Collins, Tallahassee, and Talbot D'Alemberte and Jeffrey B. Crockett of Steel, Hector & Davis, Miami, for appellee Florida Patient's Compensation Fund.
David A. Yon, Tallahassee, for appellee Dept. of Ins.
ERVIN, Judge.
In these consolidated appeals from a final order of the Department of Insurance (Department) levying $17,046,190.00 in assessments against participants in the Florida Patient's Compensation Fund (Fund), appellants contend, inter alia, that Section 768.54(3)(c), Florida Statutes (1981),[1] is unconstitutional *594 in that it amounts to an unlawful delegation of legislative power. We agree and reverse on that point without passing on the other issues raised.[2]
In response to what has been described as a medical malpractice insurance crisis, the Florida legislature enacted the "Medical Malpractice Reform Act of 1975"[3] which, in *595 part, created the "Florida Patient's Compensation Fund", the purpose of which was to limit participants' liability in malpractice actions to $100,000.00 per claim and $500,000.00 per occurrence, while providing that the balance of awards would be paid by the Fund. See Chapter 75-9, Laws of Florida. The Act permits all health care providers, other than hospitals, i.e., physicians, osteopaths, podiatrists, health maintenance organizations (HMO), ambulatory surgical centers and other medical facilities, to participate in the fund if they so choose, but hospitals are required to join unless they can demonstrate financial responsibility for malpractice claims, in which case they may be exempt from participation. Such exemption carries with it the consequence that the hospital be barred from the limited liability provided by the Fund.
The Fund is to be financed by three sources of monies: (1) base fees of $1,000.00 per individual and $300.00 per hospital bed during the first year of participation and, for later years, $500.00 per individual and $300.00 per hospital bed; (2) additional fees; and (3) assessments. When it became evident, in 1976, that the threat of a medical malpractice crisis still loomed, the legislature amended section 768.54(3)(c) to offer greater protection for physicians[4] by providing that assessments for Fund participants, other than hospitals, could not exceed *596 "an amount equal to the fees or assessments originally paid by such health care provider for participation in the fund for the year giving rise to such deficit assessment." Chapter 76-260, § 6, Laws of Florida.[5]
Although the Fund commenced operation in 1975, it was not until 1978, when deficits were first anticipated, that additional fees ranging from $1,749.00 to $12,619.00 were recommended by the Fund.[6] A public hearing was held by the Department to consider the issue of additional fees, but, after all those present, with the sole exception of the Fund, spoke out against additional fees, the Department concluded that no change in the existing fee schedule was appropriate at that time.[7] Finally, in October 1981, the Fund certified to the Department deficiencies for the fund years 1977-78 and 1978-79 totaling some $17,000,000.00,[8] and the Department levied assessments against Fund participants to make up the deficiency. The dispute, which is the subject of this appeal, arose not over the total deficiency certified by the Fund, but over the Department's allocation of the deficiency among the Fund participants. The Department, using an indicated rate method, first determined the assessments due from each of the eight categories of health care providers as defined by section 768.54(1)(b)1.-8., then interpreted section 768.54(3)(c) as precluding assessments against physicians, osteopaths, podiatrists and professional associations which would exceed the amount of fees paid by those individuals for participation in the Fund for the year found to be deficient. The Department further construed the statute as providing for unlimited assessment liability for all other health care providers. As a result, $10,500,000.00 in additional assessments for claims stemming from charges of physician malpractice was assessed against the hospitals, HMO's, ambulatory surgical centers and other medical facilities participating in the Fund, rather than against the physicians.
Appellants contend, and we agree, that section 768.54(3)(c) amounts to an unlawful delegation of legislative power due to insufficient standards and guidelines establishing the method of assessments. Before *597 addressing the merits of this argument, we must, however, dispose of two preliminary issues raised by the Fund in contesting the appellants' right to challenge the constitutionality of this statute. The Fund first asserts that because appellants voluntarily elected to participate in the Fund, they are therefore estopped from now challenging the constitutionality of a statute from which they have benefited. We agree that the doctrine of equitable estoppel may be applied in appropriate cases to bar a constitutional challenge to a statute or ordinance. See 759 Riverside Avenue, Inc. v. Marvin, 109 Fla. 473, 147 So. 848 (1933) (corporation, accepting charter from state, must do so subject to conditions prescribed by law and may not later challenge constitutionality thereof); McNulty v. Blackburn, 42 So.2d 445 (Fla. 1949) (petitioner who voluntarily accepted pension benefits for six years was estopped to challenge constitutionality of pension act); State ex rel. Watson v. Gray, 48 So.2d 84 (Fla. 1950) (candidate who accepted benefits of election law estopped from challenging that law after losing election); Baker v. State Road Department, 79 So.2d 511 (Fla. 1955) (citizens who failed to intervene in bond validation proceedings were estopped from later seeking to enjoin sale of bonds); State ex rel. Bankers Life & Casualty Company v. Village of North Palm Beach, 138 So.2d 378 (Fla. 2d DCA 1962) (landowner who accepted benefits from village for three years estopped from challenging act creating village). Nevertheless, while it is generally recognized that one who invokes the provisions of a law or partakes of advantages thereunder may not then be heard to challenge the constitutionality thereof, see Bon Ton Cleaners & Dyers, Inc. v. Cleaning, Dyeing & Pressing Board, 128 Fla. 533, 176 So. 55 (1937); 10 Fla.Jur.2d Constitutional Law § 68 (1979), there are two recognized exceptions to this rule: First, "[t]he rule is well settled in this country that when one accepts the general benefits of an act he is not estopped to challenge the constitutionality of any separable portion thereof under which he has not given or accepted benefits." Lollie v. General American Tank Storage Terminals, 160 Fla. 208, 34 So.2d 306, 308 (1948) (e.s.) (employer not estopped from challenging constitutionality of section of worker's compensation act despite acceptance of general benefits of act). See also Mojave River Irrigation District v. Superior Court, 202 Cal. 717, 262 P. 724 (Cal. 1927); City of Los Angeles v. Los Angeles City Water Company, 177 U.S. 558, 20 S.Ct. 736, 44 L.Ed. 886 (1900); 10 Fla.Jur.2d Constitutional Law § 68 (1979). Second, the "acceptance of the benefits of an act under compulsion will not preclude an attack upon the statute." Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n., Inc., 245 So.2d 625, 629 (Fla. 1971) (e.s.) (Gulfstream's acceptance of benefits of statute for twenty years did not estop it from challenging constitutionality of statute). See also 16 Am.Jur.2d Constitutional Law § 211 (1979); 10 Fla.Jur.2d Constitutional Law § 68 (1979). We find that both exceptions apply in this case to preclude application of the doctrine of estoppel. There can be little doubt that appellants have generally benefited from the operation of section 768.54. Section 768.54(3)(c) is, however, a separable portion of that statute dealing only with the mechanics of financing the Fund, and, as such, may be challenged despite appellants' utilization of the general provisions of the statute.
Although the Fund contends that appellants voluntarily elected to participate in the Fund, we also find that their participation was made virtually compulsory by section 768.54(2)(a), which, while authorizing voluntary participation for all health care providers other than hospitals, made participation mandatory for all hospitals in Florida[9] unless they could qualify for exemption by demonstrating financial responsibility for claims through one of the following means:

*598 1. Post bond in an amount equivalent to $10,000 per claim for each hospital bed in said hospital, not to exceed a $2,500,000 annual aggregate;
2. Prove financial responsibility in an amount equivalent to $10,000 per claim for each hospital bed in said hospital, not to exceed a $2,500,000 annual aggregate, to the satisfaction of the board of governors of the fund, through the establishment of an appropriate escrow account;
3. Obtain professional liability coverage in an amount equivalent to $10,000 or more per claim for each bed in said hospital from a private insurer, from the Joint Underwriting Association established under subsection 627.351(7), or through a plan of self-insurance as provided in s. 627.357; however, no hospital shall be required to obtain such coverage in an amount exceeding $2,500,000 annual aggregate.
§ 768.54(2)(c), Fla. Stat. (1977). Given those alternatives, we conclude that appellants' participation in the Fund cannot realistically be said to be voluntary; therefore they are not estopped from challenging the constitutionality of section 768.54(3)(c).
We also reject the Fund's contention that appellants lack standing to raise constitutional issues. It is fundamental that a person may not challenge the constitutionality of a statute "unless his rights are in some way injuriously and directly affected" by the operation of the statute. E.M. Watkins & Co., Inc. v. Board of Regents, 414 So.2d 583, 588 (Fla. 1st DCA 1982). See also Rhaney v. Dobbs House, Inc., 415 So.2d 1277 (Fla. 1st DCA 1982); Robbins v. Rophie Shoes, Inc., 413 So.2d 839 (Fla. 1st DCA 1982); Jack Eckerd Corporation v. Coker, 411 So.2d 1026 (Fla. 1st DCA 1982); Miami Beach Kennel Club, Inc. v. Board of Business Regulation, 265 So.2d 373 (Fla. 3d DCA 1972). It is without question that appellants are directly financially affected by the operation of section 768.54(3)(c) in that they face a potential increased liability of $10,500,000.00 for malpractice claims incurred by physicians.
Although we find that appellants have the requisite standing to challenge section 768.54(3)(c), it is equally clear that they "may not challenge those portions of an enactment which do not adversely affect [their] personal or property rights." Sandstrom v. Leader, 370 So.2d 3, 4 (Fla. 1979). See also Greenway v. State, 413 So.2d 23 (Fla. 1982). Therefore, appellants have standing to challenge only section 768.54(3)(c), and not all of section 768.54, because they are adversely affected only by that portion of the statute.
We turn then to what we consider to be the dispositive issue: whether section 768.54(3)(c) amounts to an unconstitutional delegation of legislative powers. That the legislature may delegate non-legislative duties to administrative agencies is no longer subject to dispute. In Florida, however, such delegation is subject to the constitutional mandate that "[t]he powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Art. II, § 3, Fla. Const. Although rejected by courts in some jurisdictions and the subject of criticism in others,[10] *599 the doctrine of nondelegation remains alive and well in Florida jurisprudence. See Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla. 1978); Hialeah, Inc. v. Gulfstream Park Racing Association, Inc., 428 So.2d 312 (Fla. 4th DCA 1983). The doctrine is premised on the rule that "[t]he Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law... ." State, Department of Citrus v. Griffin, 239 So.2d 577, 580 (Fla. 1970). "The distinction is said to be one between `delegation of the power to make the law, which necessarily involves a discretion as to what the law shall be, and the conferring of authority or discretion in executing the law pursuant to and within the confines of the law itself.'" Brewer v. Insurance Commissioner and Treasurer, 392 So.2d 593, 595 (Fla. 1st DCA 1981) (citing Connor v. Joe Hatton, Inc., 216 So.2d 209, 211 (Fla. 1966)). No unconstitutional delegation of legislative power occurs, however, if a statute, conferring duties and powers on an administrative agency, contains sufficient standards and guidelines under which the agency is to act:
[S]tatutes granting power to administrative agencies must clearly announce adequate standards to guide the agencies in the execution of the powers delegated. The statute must so clearly define the power delegated that the administrative agency is precluded from acting through whim, showing favoritism, or exercising unbridled discretion.
Lewis v. Bank of Pasco County, 346 So.2d 53, 55-56 (Fla. 1977). "When legislation is so lacking in guidelines that neither the agency nor the courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law." Cross Key Waterways, 372 So.2d at 918-919. See also Solimena v. State, Department of Business Regulation, 402 So.2d 1240, 1245 (Fla. 3d DCA 1981).
The determination of whether section 768.54(3)(c) amounts to an unlawful delegation turns, therefore, on whether the legislature, in enacting that section, provided sufficient standards and guidelines to the Department for its proper administration of the Fund. At the outset we reject the Fund's assertion that the legislature was overly explicit in enacting this section. Even a cursory examination evidences to us an almost total absence of guidelines and standards for the establishment of fees and assessments. As far as base fees for individuals and hospitals are concerned, the statute is explicit in setting such fees for the first year of participation and for ensuing years. For all other health care providers electing to participate in the Fund, however, base fees are to be "established by the fund on an actuarially sound basis." § 768.54(3)(c) (e.s.). As to the latter class, the statute leaves to the Fund the sole discretion for establishing the amount of such fees, rather than the agency that is delegated the responsibility for administering the statutes.
Section 768.54(3)(c) also provides that base fees in general may be "adjusted downward" for any fiscal year in which a "lesser amount would be adequate," but again no statutory guidelines are provided to assist in making such a determination, which is apparently also left to the sole discretion of the Fund, not the Department.
Additional fees "may" be charged[11] on a prorated basis, upon consideration of the following factors:

*600 1. Past and prospective loss and expense experience in different types of practice and in different geographical areas within the state;
2. The prior claims experience of the members covered under the fund; and
3. Risk factors for persons who are retired, semi-retired, or part-time professionals.
The statute does state that additional fees are to be based on "not more than two geographical areas with three categories of practice and with categories which contemplate separate risk ratings for hospitals, for health maintenance organizations, for ambulatory surgical facilities, and for other medical facilities," and are to be set by the Department after consultation with the Fund. It is otherwise silent, however, as to how or when additional fees are to be set and, most importantly, whether they are, as appellants insist, a prerequisite to the levying of assessments.
The most obvious absence of standards and guidelines is found in those parts of section 768.54(3)(c) dealing with assessments. The Fund is given total discretion in determining whether the monies collected in a given fund year are in excess of or insufficient to satisfy claims made against the fund year. In either case, the Fund is to "certify" the amount of excess or insufficiency to the Insurance Commissioner, who is then authorized to order a refund or levy an assessment as requested by the Fund. No guidance is given the Fund to assist it in determining whether a refund or an assessment is necessary, nor is there any provision for review by the Department of the certification to determine its accuracy. In fact, the record before us reveals that the Department merely accepted the amount certified by the Fund and levied assessments without making any attempt to verify the accuracy of the Fund's request.
The sole statutory standard for the levying of assessments appears to be the directive that the amounts must "fairly reflect the classifications prescribed above" and be sufficient to meet all claims for the fund year in question. This ambiguous standard has been interpreted by the Fund as requiring application of the three factors set out above for the proration of additional fees to the eight categories of health care providers as defined in section 768.54(1)(b)1.-8. Appellants, on the other hand, interpret the phrase "classifications prescribed above" as referring only to the three factors relating to additional fees. The statute, unfortunately, offers no assistance in deciphering the legislative intent in creating the standard.
Finally, section 768.54(3)(c) limits assessments for physicians, osteopaths, podiatrists and professional associations to "an amount equal to the fees originally paid by such health care provider for participation in the fund for the year giving rise to such assessment." The hearing officer below concluded that since the language "imposed a `cumulative' cap on the liability for physicians, osteopaths and podiatrists for assessments for deficits for a given coverage year, ... those participants are liable only for a maximum of either $1,000.00 or $500.00 in assessments, depending upon whether the year in question was their first year or a subsequent year of participation." While that interpretation is shared by the Fund and the Department, appellants offer two alternative interpretations which are equally plausible.[12] We find, however, that *601 it is impossible to determine, from the statutory language employed, the legislature's actual intent and that, as in the other portions of this poorly drafted statute, the absence of standards and guidelines for the allocation of assessments among Fund participants renders section 768.54(3)(c) constitutionally infirm.
It is our opinion that section 768.54(3)(c) is so lacking in standards and guidelines that neither the Fund, the Department, nor this court can determine whether the legislature's intent in enacting this statute is being properly administered by the Department. We therefore conclude that section 768.54(3)(c) is unconstitutional as an unlawful delegation of legislative authority.
Accordingly, this cause is REVERSED and remanded for further proceedings not inconsistent with this opinion.
MILLS, J., and PEARSON, TILLMAN (Ret.), Associate Judge, concur.
NOTES
[1] Section 768.54(3)(c), Florida Statutes (1981), provides, in pertinent part:

(c) Fees and assessments  Annually, each health care provider, as set forth in subsection (2), electing to comply with paragraph (2)(b) shall pay the fees established under this act, for deposit into the fund, which shall be remitted for deposit in a manner prescribed by the Insurance Commissioner.... For the first year of membership, each participating health care provider shall pay a base fee for deposit into the fund in the amount of $1,000 for any individual, or $300 per bed for any hospital... . The base fee charged after the first year of participation shall be $500 for any individual, or $300 per bed for any hospital. The base fees to be paid by those health care providers defined in subparagraphs (1)(b)5., 6., 7., and 8. shall be established by the fund on an actuarially sound basis. In addition, after the first year of operation, additional fees may be charged but shall be appropriately prorated for the portion of the year for which the health care provider participated in the fund, based on the following considerations:
1. Past and prospective loss and expense experience in different types of practice and in different geographical areas within the state;
2. The prior claims experience of the members covered under the fund; and
3. Risk factors for persons who are retired, semi-retired, or part-time professionals.
Such base fees may be adjusted downward for any fiscal year in which a lesser amount would be adequate and in which the additional fee would not be necessary to maintain the solvency of the fund. Such additional fee shall be based on not more than two geographical areas with three categories of practice and with categories which contemplate separate risk ratings for hospitals, for health maintenance organizations, for ambulatory surgical facilities, and for other medical facilities... . Participants shall only be liable for assessments for claims from years during which they were members of the fund; in cases in which a participant is a member of the fund for less than the total fiscal year, a member shall be subject to assessments for that year on a pro rata basis determined by the percentage of participation for the year... . Additional fees, assessments, or refunds shall be set by the Insurance Commissioner after consultation with the board of governors of the fund... . If the fund determines that the amount of money in an account for a given fiscal year is in excess of or not sufficient to satisfy the claims made against the account, the fund shall certify the amount of the projected excess or insufficiency to the Insurance Commissioner and request the Insurance Commissioner to levy an assessment against or refund to all participants in the fund for that fiscal year prorated based on the number of days of participation during the year in question. The Insurance Commissioner shall order such refund to, or levy such assessment against, such participants in amounts that fairly reflect the classifications prescribed above and are sufficient to obtain the money necessary to meet all claims for said fiscal year. In no case shall any assessment for a particular year against any health care provider, other than those health care providers defined in subparagraphs (1)(b)1., 5., 6., and 7., exceed an amount equal to the fees originally paid by such health care provider for participation in the fund for the year giving rise to such assessment.
(emphasis supplied) Although this section has undergone extensive changes since its enactment in 1975, see Chapters 76-168, 76-260, 77-64, 77-174, 77-457, 78-47, 79-178, 80-91, 80-328, 81-318, 82-236, 82-243, 82-386, 82-391, Laws of Florida, our concern in this case is directed toward the 1981 version, set out above, because the assessments in question were certified and levied in late 1981 and early 1982.
[2] Appellant, Highlands County Hospital District, contends that the Department incorrectly interpreted section 768.54(3)(c) and then failed to present competent, substantial evidence before the hearing officer to support its position. We find no merit in that argument; particularly in view of the fact that appellants were afforded a full administrative hearing on the issues raised, and the hearing officer, in an exhaustive recommended order, which the Department adopted, concluded that the assessments levied by the Department were proper. In such circumstances our review is limited to the following standard:

When in Section 120.57 proceedings to construe and apply a nonpenal regulatory statute an independent hearing officer and the agency agree on a dispositive finding, there is little cause for a district court of appeal to debate whether the matter in issue is more nearly adjudicative fact or statutory policy and whether the hearing officer's or the agency's finding must prevail. See McDonald v. Dept. of Banking and Finance, 346 So.2d 569, 579 (Fla. 1st DCA 1977). In such a case our task is only to assure that the affected party was protected by adherence to Chapter 120 processes, that the dispositive finding is supported by substantial competent evidence appropriate to the issue, and that the agency was not "clearly erroneous or unauthorized," Gay v. Canada Dry Bottling Co. of Florida, Inc., 59 So.2d 788, 790 (Fla. 1952), in interpreting the statute given in its charge to enforce.
Barker v. Board of Medical Examiners, 428 So.2d 720 (Fla. 1st DCA 1983) (emphasis supplied). The record reflects that appellants were afforded the full protections of Chapter 120, that there was competent substantial evidence to support the hearing officer's recommendations and that the Department's actions were not clearly erroneous or unauthorized and we therefore reject this point.
All appellants also challenge the constitutionality of section 768.54(3)(c), both facially and as applied to them, on grounds of unlawful delegation, equal protection, due process and the pledging of public credit for private purposes. Although the hearing officer, correctly, did not pass on these constitutional issues, they are properly before this court for consideration. See Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla. 1982). Because we find the issue of unlawful delegation to be dispositive, we do not address the remaining constitutional issues raised. See Askew v. Cross Key Waterways, 372 So.2d 913, 918 (Fla. 1978).
[3] The Medical Malpractice Reform Act has been a source of controversy since its inception. It has, for example, been suggested that the malpractice "crisis" in 1975 never existed and was merely a creation of the insurance industry. See Cunningham & Lane, Malpractice  The Illusory Crisis, 54 Fla.Bar J. 114 (1980), Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365, 369 (Fla. 1981) (Sundberg, C.J., Dissenting). The Act has been subject to a number of constitutional challenges with varying results. See Pinillos (exception to collateral source rule in malpractice actions does not violate equal protection rights); accord Lower Florida Keys Hospital District v. Skelton, 404 So.2d 832 (Fla. 3d DCA 1981). See also Carter v. Sparkman, 335 So.2d 802 (Fla. 1976) (medical mediation panels are not an unconstitutional denial of access to courts); Aldana v. Holub, 381 So.2d 231 (Fla. 1980) (medical mediation panels held unconstitutional on due process grounds); Mercy Hospital, Inc. v. Menendez, 371 So.2d 1077 (Fla. 3d DCA 1979), after remand, 400 So.2d 48 (Fla. 3d DCA 1981) (requirement that Fund be joined as party to malpractice action upheld); McCarthy v. Mensch, 412 So.2d 343 (Fla. 1982) (admissibility of conclusion of medical mediation panel not violative of due process rights); The Florida Bar, In re: Rules of Civil Procedure, 429 So.2d 311 (Fla. 1983) (Fla.R.Civ.P. 1.450(e), prohibiting reference to insurance coverage in medical malpractice actions, upheld). See also Spence, J.B. & Roth, J., Closing the Courthouse Door: Florida's Spurious Claims Statute, 11 Stetson L.Rev. 283 (1982) (suggesting that the claims statute, requiring the loser in malpractice actions to pay the prevailing party's attorney's fee, violates constitutional rights of equal protection and access to courts).
[4] The preamble to Chapter 76-260, Laws of Florida, expresses the legislature's intent in amending section 768.54(3)(c), as follows:

WHEREAS, despite the responsive and responsible actions of the 1975 session of the Legislature, professional liability insurance premiums for Florida physicians have continued to rise and, according to the best available projections, will continue to rise at a dramatic rate, and
WHEREAS, insurance companies across America are continuing to withdraw from the medical professional liability insurance market so that such insurance, even at exorbitant rates, is becoming virtually unavailable in the voluntary private sector, and
WHEREAS, the maximum rates for essential medical specialists such as cardio-vascular surgeons, neurosurgeons, orthopedic surgeons, and anesthesiologists range from $8,200 in physician-owned trusts to $24,000 through the JUA, and
WHEREAS, a certain amount of these premium costs are passed on to the consuming public through higher costs for health care services in addition to the heavy and costly burden of "defensive medicine" as physicians are forced to practice with an overabundance of caution to avoid potential litigation, and
WHEREAS, this insurance crisis threatens the quality of health care services in Florida as physicians become increasingly wary of high-risk procedures and are forced to downgrade their specialties to obtain relief from oppressive insurance rates, and
WHEREAS, this crisis also poses a dire threat to the continuing availability of health care in our state as new young physicians decide to practice elsewhere because they cannot afford high insurance premiums and as older physicians choose premature retirement in lieu of a continuing diminution of their assets by spiraling insurance rates, and
WHEREAS, our present tort law/liability insurance system for medical malpractice will eventually break down and costs will continue to rise above acceptable levels, fundamental reforms of said tort law/liability insurance system must be undertaken, and
WHEREAS, the continuing crisis proportions of this compelling social problem demand immediate and dramatic legislative action... .
(emphasis supplied)
[5] Although the 1976 amendment to section 768.54(3)(c) limited assessments for physicians to the amount of "fees or assessments" originally paid, that language was again amended, in 1978, to limit such liability to only the amount of "fees" originally paid. See Ch. 78-47; § 2, Laws of Florida. The 1981 version of that section, with which we are concerned, likewise refers only to "fees" originally paid.
[6] The Fund obtained the services of an independent actuarial firm to determine the amount of monies needed to satisfy claims anticipated for the fund year 1978-79 and, based on the actuarial report, requested the following additional fees for that year:

CLASS I PHYSICIANS
Dade/Broward Co. $2,233.00
Rest of State 1,749.00
CLASS II PHYSICIANS
Dade/Broward Co. 4,420.00
Rest of State 3,549.00
CLASS III PHYSICIANS
Dade/Broward Co. 12,619.00
Rest of State 10,297.00
HOSPITALS
(per occupied bed) 222.00
AMBULATORY SURGICAL
CENTERS
(per 100 patients) 22.00
HEALTH MAINTENANCE
ORGANIZATIONS
(per 100 subscribers) 150.00
PROFESSIONAL 20% of additional fee
ASSOCIATIONS to be paid by each
 individual member

Had that recommendation been approved, the Fund contends, fees totaling $18,879,530.00 would have been generated for 1978-79, which would have prevented the present deficit and would have fairly allocated the costs to all participants.
[7] Although appellants contend that there was insufficient public notice of the hearing on the issue of additional fees in 1978, and that their interests, therefore, were not adequately represented before the Department at the hearing, we find that the record clearly refutes that argument.
[8] On October 31, 1981, the Fund certified to the Department a deficiency of $1,350,672.00 for the Fund year 1977-78 and, on January 18, 1982 it certified an additional deficiency for the same year totaling $1,759,591.00. On January 18, 1982 the Fund also certified a deficiency of $13,935,927.00 for the Fund year 1978-79.
[9] Section 768.54(2)(a) was amended in 1980 to exempt from participation any hospital operated by an agency of the state regardless of such hospital's ability to show financial responsibility for claims. See Ch. 80-328, § 1, Laws of Florida.
[10] In Cross Key Waterways, the Florida Supreme Court, reiterating this state's adherence to the nondelegation doctrine, noted that

Professor [Kenneth Culp] Davis [of the University of Chicago College of Law] maintains that there should be a shift in emphasis from legislatively imposed standards for administrative action to procedural safeguards in the administrative process. He supports his rationale by citation to federal decisions as well as decisions from a minority of state court jurisdictions. His premises are that (1) strict adherence to the nondelegation doctrine would stultify the administrative process; (2) the doctrine, in fact, has been used as a label to invalidate legislation of which courts disapprove without any rational distinction between standards approved and those disapproved; and (3) the danger of arbitrary or capricious administrative action is best met through procedural due process safeguards in the administrative process.
* * * * * *
Although the Davis view is an entirely reasonable one as demonstrated by its adoption in the federal courts and a minority of state jurisdictions, nonetheless, it clearly has not been the view in Florida... . Should this Court, then, accept the invitation of appellants to abandon the doctrine of nondelegation of legislative power which is not only firmly embedded in our law, but which has been so continuously and recently applied? ... We believe stare decisis and reason dictate that we not.
372 So.2d at 922-924 (citations omitted).
[11] As initially enacted, section 768.54(3)(c) provided that "... after the first year of operation additional fees shall be assessed... ." Ch. 75-9, § 15, Laws of Fla. That section was not amended to read "... after the first year of operation, additional fees may be charged ..." until 1978. Ch. 78-47, § 2, Laws of Fla. No explanation was given by any of the parties to this appeal for the Department's disregard of the statutory directive to charge additional fees between the years 1975 and 1978. The fact that additional fees were mandated by section 768.54(3)(c) during those years supports appellants' position that the establishment of such fees is a condition precedent to the levying of assessments.
[12] Appellants first insist that the proper interpretation of section 768.54(3)(c) requires an actuarially sound Fund made up of base fees and additional fees, fairly reflecting the statutory classifications. Assessments, they contend, are only a means of fine tuning the Fund if deficiencies occur. If, however, the second step, that of establishing additional fees, is skipped, as the Department has done each year since the inception of the Fund, appellants next contend that there is no statutory prohibition barring multiple assessments against all Fund participants. For example, if the Fund year 1977-78 were found to be deficient, physicians could each year be assessed an amount equal to the fees they originally paid for participation during that Fund year until such deficiency was eliminated. When asked at deposition whether the latter interpretation had any validity, the Department's General Counsel, while observing that section 768.54(3)(c) was susceptible to many interpretations, answered in the affirmative.